IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| Donald R. Triplett, Jr., | § | Case No. 19-42570 |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| ———————————————— | § | |
| | § | |
| Shawn Valk and Ron Valk, as Assignees | § | |
| of Estate Claims of Donald R. Tripplett, Jr., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 21-4106 |
| | § | |
| Copper Creek Distributors, Inc., and | § | |
| Jose Doniceth Escoffie, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

On December 6, 2022, this Court conducted a trial on the "Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 548 and 550" filed by Shawn and Ron Valk (collectively, the "**Plaintiffs**" or the "**Valks**"), as assignees of the claims of Donald R. Triplett, Jr.'s bankruptcy estate, against Copper Creek Distributors, Inc. and Jose Doniceth "Doni" Escoffie (collectively, the "**Defendants**"). The Plaintiffs to avoid and recover 71 transfers (totaling $158,807.43) that Triplett allegedly made to the Defendants with actual or constructive fraudulent intent under §§ 548 and 550 of the Bankruptcy Code.[1] The Court allowed the parties to submit written closing and took this proceeding under advisement to prepare a detailed written ruling. The Court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A),

---

[1] The Plaintiffs referenced the Texas Uniform Fraudulent Transfer Act, *see* TEX. BUS. COM. CODE § 24.001 *et. seq.*, in the parties' joint pretrial order. The Plaintiffs clarified at trial that there were proceeding only under § 548 of the Bankruptcy Code.

(H) and (O).  This Memorandum Opinion embodies the Court's findings of fact and conclusions of law.  *See* FED. R. BANKR. P. 7052.[2]

## RELEVANT FACTUAL BACKGROUND

### The Debtor's Relationship with the Defendants

1.      Prior to bankruptcy, Donald R. Triplett, Jr. (the "**Debtor**") was in the business of commercial and residential construction, remodeling, and design.

2.      The Debtor engaged in business using the names "DFW Design & Remodeling" and "Preferred Platinum Construction," among other business names.[3]

3.      The Debtor is married to Jose Doniceth Escoffie, who the Court will refer to by his preferred name of "Doni" for clarity.  The Debtor and Doni live together in a home owned by the Debtor.

4.      Alex Escoffie and Jose Escoffie are relatives of the Debtor's husband.  The Debtor has raised the boys since they were ten or eleven years old.  The Debtor refers to Alex and Jose Escoffie as his sons or stepsons.

5.      The Debtor formed Copper Creek Distributors, Inc. ("**Copper Creek**") on July 27, 2017.  Its original directors were the Debtor and Doni.  The Debtor and Doni testified, however, that Doni is and has always been the sole owner of Copper Creek.

6.      Doni testified that Copper Creek was an online business that sold products such as flooring, tile, and lighting to the Debtor and a handful of other customers.  Doni's role at Copper

---

[2] To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such.  Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

[3] The Debtor did business using a variety of business names.  In addition, the Debtor had an ownership interest in several corporations and limited liability companies prior to bankruptcy.  The Debtor listed numerous business interests in his "Schedule A/B Property" filed in his bankruptcy case.

Creek was limited at first because he was learning the business. Doni initially relied on the Debtor to generate invoices and run the business.

7.     Doni could not recall the names of any initial customers other than the Debtor.

8.     Doni testified that he became more involved in Copper Creek's business in 2018. He and the Debtor testified that Copper Creek's business expanded from selling products to also doing construction and remodeling in 2018.

9.     Doni testified that Copper Creek grew to service 50-60 customers but could not recall any names other than his husband. Doni also struggled to interpret the abbreviations used on Copper Creek's invoices.

10.     The Debtor retained authority to buy product and pay bills for Copper Creek in 2018 and 2019.

11.     In and around June 2018, the Debtor was remodeling a guest house at his home. The Debtor obtained materials from Copper Creek, and Copper Creek generated invoices for the labor and materials it supplied to the Debtor.

12.     The 71 transfers at issue in this proceeding were made by the Debtor to Copper Creek from his personal account as well as an account he held for doing business as "Preferred Platinum Construction." The dates of the transfers range from September 20, 2017 – which was two years prior to bankruptcy – to August 7, 2019. The transfers total $158,807.43. Out of the 71 transfers, only seven involve precise dollar amounts as opposed to "round dollar" amounts.

13.     At trial, Doni's exhibits included bank statements showing that Copper Creek made numerous transfers to the Debtor over the period from September 21, 2017, through August 2, 2019. These transfers from Copper Creek to the Debtor totaled $87,885.59.[4] The transfers were

---

[4] In their written closing argument, the Defendants list the transfers from Copper Creek to the Debtor in a spreadsheet that includes specific references to bank statements (Defendants' Exhibits G, H and R). Several of the

made from Copper Creek's accounts at Prosperity Bank (accounts ending in 7679 and 7687) to the Debtor's personal account at Prosperity Bank (account ending in 7043) and an account the Debtor held at Prosperity Bank for doing business as "Preferred Platinum Construction" (account ending in 6778). Copper Creek also made several payments on the Debtor's car note (TD Auto) and his home mortgage (REI).

14.     The Debtor testified that Copper Creek sometimes "loaned" him money to pay his personal bills such as his house and car payment. The Debtor testified that Copper Creek sometimes provided him with services or materials without charge and, when he got a draw from a job, he would pay Copper Creek for what it had advanced. In addition, the Debtor testified that Copper Creek deposited some of its sales proceeds directly into his personal bank account via a mobile payment processing application.

15.     The Defendants provided this Court with an exhibit (prepared by the Debtor) that described many of the transfers from Copper Creek as "loans" to the Debtor and many of the Debtor's transfers to Copper Creek as "loan repayments." Specifically, the Debtor and Doni testified that Copper Creek's transfers to the Debtor including his d/b/a, Preferred Platinum Construction, from August 2017 through August 2019 totaling $104,488.54 were "loans." [5] They characterized certain transfers from the Debtor and his business to Copper Creek during the same period totaling $63,762.02 as "loan repayments."

---

listed transfers (totaling $16,602.95) occurred more than two years prior to bankruptcy and the Court has excluded them from its analysis.

[5] These figures do not align with the Valks complaint because, according to the Debtor, the exhibit he prepared for the Defendants contains a more complete analysis of all the transactions between the Debtor and Copper Creek.

### The Debtors Relationship with Ron and Shawn Valk

16.     Ron and Shawn Valk are in the construction business with a focus on the construction of storage facilities.  The Valks did business as "Platinum Construction."  According to the Valks, the Debtor began supervising their construction projects in August 2016.

17.     The Debtor's relationship with the Valks had soured by September 2017.  Shawn Valk testified that in September 2017, he discovered the Debtor had been taking laborers off Platinum Construction's job sites, putting them on his own jobs, and fraudulently inducing the Valks to pay for their work.

18.     In January 2018, the Valks sued the Debtor for theft of labor in the amount of $350,000, among other things.  In addition, in early 2018, Shawn Valk sued the Debtor over their respective ownership interest in TV Arrowhead, LLC ("**TV Arrowhead**").

19.     According to documents filed in the Debtor's bankruptcy case, Shawn Valk and the Debtor were managing members of TV Arrowhead, whose only asset was a lake house.  A dispute arose between the Debtor and Shawn Valk regarding the allocation of capital contributions to TV Arrowhead, and Valk sued the Debtor, seeking to wind up the business.

20.     The state court approved a sale of the lake house for $625,000, and the sale was set to close on September 20, 2019.  The day before the closing, the Debtor filed bankruptcy.

### The Debtor's Bankruptcy Case

21.     The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 19, 2019.

22.     Shawn Valk promptly moved for relief from the automatic stay so the sale of the lake house could proceed.  This Court granted the motion.  The sale of TV Arrowhead's lake house

closed on September 30, 2019, and the Chapter 7 trustee received net sales proceeds of $578,000.24 to hold in escrow pending a resolution of the ownership dispute with Shawn Valk.

23.    The Debtor subsequently filed his required bankruptcy schedules and statements.

24.    In his bankruptcy schedules, the Debtor stated that the value of his home was $225,000.  The Debtor reported less than $50 in several checking accounts and no interest in any retirement or investment accounts on his petition date.

25.    In his "Statement of Financial Affairs" ("**SOFA**"), the Debtor identified numerous legal actions in which he was a party in the year preceding bankruptcy.  The litigation included several lawsuits by and against the Debtor, Ron Valk, Shawn Valk and the Valks' business, Platinum Construction (which is distinct from the Debtor's similarly named d/b/a, Preferred Platinum Construction).  The litigation also included two lawsuits brought against the Debtor by Jeremy Haltom.

26.    The Debtor exempted his home and household items from his creditors.  His primary non-exempt assets were his claims against the Valks and Valk-related entities and his interest in TV Arrowhead.

27.    In his "Schedule A/B: Property," the Debtor stated that Ron Valk owed him an unknown amount of money.  The Debtor described Ron Valk's alleged debt to him as follows:

> Platinum Construction Ron Valk owes debtor for multiple projects completed for him. They have liens on them. He also owes me for product he stole. As well as money for construction work completed on his personal home and office. All subject to ongoing law suits. Also owed 10% if [sic] backend profit on two commercial building sales.

28.    In his "Schedule A/B: Property," the Debtor listed the following accounts receivable in the total amount of $221,061 owed to him by Ron Valk:[6]

---

[6] In the claim filed by Ron Valk in this case, discussed infra, he explains that he is seeking to recover from the Debtor with respect to the "Maple Avenue Project" and "Locus Grove Project" based on the Debtor's alleged fraud.

Ronald Valk- Platinum Construction Maple $77,000
Ronald Valk- Platinum Construction Locus Grove $54,061.00
Ronald Valk Personal $30,000.00
Ronald Valk Saro LLC $60,000.00

29.    In his "Schedule A/B: Property," the Debtor stated that he had a 50% interest in TV Arrowhead, which he valued at $325,000.

30.    In his "Schedule E/F: Creditors Who Have Unsecured Claims," the Debtor listed a total of $3,128,635.86 in liabilities. His undisputed debts included a priority claim for debt owed to the Internal Revenue Service ("**IRS**") in the estimated amount of $160,000. The IRS filed a proof of claim in the total amount of $173,413.61 for taxes due for tax years 2006, 2007, 2008, 2010, 2011, 2014, 2017 and 2018.

31.    The Debtor's bankruptcy schedules included numerous unsecured, non-priority creditors on the petition date, including Capital One Bank, Barklay's Bank, Citibank, Colonial Bank, Cowboys Card Services, Credit One, and First National Credit Card. The Debtor listed each of their claims as undisputed.

32.    Shawn Valk filed Claim No. 30-1 asserting an unsecured claim in the amount of $512,280.25. His claim was based on his alleged right to reimbursement for expenditures and contributions he individually made for the benefit of and toward TV Arrowhead's lake house.

33.    In addition, the Valks filed the following claims against the Debtor in his bankruptcy case: (i) Claim No. 31-1 filed by Ron Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud; and (ii) Claim No. 32-1 filed by Shawn Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud.

34.     Claim numbers 31-1 and 32-1 are identical.  In their proofs of claim, the Valks detail their claims in the litigation they brought against the Debtor in state court in 2018 regarding theft of labor, among other things.  The litigation was pending when the Debtor filed for bankruptcy.

35.     In April 2021, the Chapter 7 trustee filed a motion seeking approval of a compromise and settlement agreement with Shawn Valk.  The Court entered an order approving the settlement agreement on May 14, 2021.  Pursuant to the settlement agreement, the estate received $153,708.90 from the sale of TV Arrowhead's lake house, and Shawn Valk withdrew his claim number 30-1, among other things.

36.     The Debtor's bankruptcy schedules and statements, and the claims filed in his case, show that several state court judgments were entered against him in the years leading up to bankruptcy.  For example, the Debtor listed an undisputed, unsecured debt of $32,512.46 owed to Kevin Otto, which arises from a judgment entered in a lawsuit brought by Otto in 2014 according to the Debtor's SOFA.  The Debtor also listed an undisputed, unsecured debt owed to Sheldon Snyder, which arises from a judgment entered in a lawsuit brought by Snyder in 2012 according to the Debtor's SOFA.  Snyder filed a claim against the Debtor in his bankruptcy case, which attached the state court judgment entered on October 18, 2018, in the amount of $88,217.39.  And on August 19, 2019, a state court entered a final judgment against the Debtor in the principal amount of $174,926.70 in favor of Keith Black, who sued the Debtor in 2018 according to the Debtor's SOFA.  All these judgments remained unpaid on the petition date.

37.     On August 3, 2021, the Chapter 7 trustee filed a motion seeking approval of the sale of certain claims and causes of action.  As described in the motion, as amended, the estate held an interest in one or more claims or causes of action that had been asserted or could have been

asserted in several lawsuits that were pending on the petition date as well as potential avoidance actions.

38.   Ron and Shawn Valk offered to purchase all the estate claims and rights described in the trustee's motion.  In consideration for the estate's sale and assignment of its claims and rights, the Valks agreed to (i) pay the estate the sum of $50,000.00 and (ii) the subordination of the remaining Valk proofs of claim to all allowed claims in the bankruptcy case.

39.   The Debtor objected to the proposed sale.  He testified at the trial of this adversary proceeding that his claims against the Valks were worth at least $1 million and $50,000 was a "pittance."  Following a hearing on August 26, 2021, the Court approved the Chapter 7 trustee's motion over the Debtor's objection.

40.   The Valks subsequently initiated this adversary proceeding seeking to recover 71 allegedly fraudulent transfers made by the Debtor to his husband's business in the two years prior to bankruptcy.  In addition, the Valks initiated proceedings seeking to recover alleged fraudulent transfers from: (i) the Debtor's business (DFW Design & Remodeling, LLC, Adv. Proc. No. 21-4109, for $25,225.90); (ii) the Debtor's putative stepson (Alejandro "Alex" Escoffie, Adv. Proc. No. 21-4107, for $17,012.81); (iii) the Debtor's other putative stepson (Jose S. Escoffie, Adv. Proc. No. 21-4108, for $6,568.85); and (iv) the Debtor's friend and his friend's business (Darryl Briggs and Copper Creek Properties, LLC, Adv. Proc. No. 21-4110, for $9,427.84).[7]

41.   While these matters were pending in this Court, Ron Valk d/b/a Platinum Construction pursued claims against Copper Creek Distributors, Inc. d/b/a Copper Creek Restoration and Construction, Jose Doniceth Escoffie and Daryl Briggs in Texas state court.  That

---

[7] As noted above, the Court tried this matter on December 6, 2022.  The Court tried Adv. Proc. Nos. 21-4107 and 21-4108 on December 7, 2022.  The Court tried Adv. Proc. No. 21-4109 on October 24, 2022.  Finally, the parties settled Adv. Proc. No. 21-4110 prior to the scheduled trial.

matter proceeded to a jury trial in November 2022.  The jury rendered a verdict shortly before the trial of this adversary proceeding.

42.    The present adversary proceeding against Copper Creek and Doni Escoffie does not involve any of the claims asserted in the Valk proofs of claim or any of the pre-petition litigation by or against the Debtor and the Valks.  Rather, in this adversary proceeding, the Valks seek to establish that 71 transfers from the Debtor to Copper Creek, which Doni owns, were actually or constructively fraudulent under § 548 of the Bankruptcy Code.  And they seek to recover the value of the actually or constructively fraudulent transfers from Copper Creek and Doni pursuant to § 550(a).

## DISCUSSION

### Standing

1.    As an initial matter, the Defendants contend that the Valks failed to establish standing to bring this suit because they have not alleged the existence of a so-called "triggering" creditor as required by § 544(b) to bring an action under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**").

2.    Although the Valks referenced provisions of TUFTA in the parties' joint pre-trial order as well as § 548 of the Bankruptcy Code, their counsel clarified at trial that they are only proceeding under Bankruptcy Code § 548.

3.    Section 548 does not apply a "triggering" creditor rule.  As explained by the Northern District of Texas in *United States Bank Nat'l Ass'n v. Verizon Communs., Inc.*, 479 B.R. 405 (N.D. Tex. 2012):

> While there are many similarities between Sections 544(b) and 548, the bankruptcy trustee's power under these two provisions is not identical. Under Section 544(b), the bankruptcy trustee's ability to avoid transfer comes from the existence of a "triggering" creditor that could have brought a state law fraudulent transfer claim

at the time of the filing of the bankruptcy petition. **In contrast, there is no requirement that there be such a "triggering" creditor at all. Instead, Section 548 is a simple grant of power to the bankruptcy trustee to avoid transfers under certain circumstances.**

*United States Bank Nat'l Ass'n*, 479 B.R. at 415 (emphasis added).

4.      The Court, therefore, turns to the substance of the parties' claims and defenses.

### Actual Fraud - § 548(a)(1)(A)

5.      Pursuant to 11 U.S.C. § 548(a)(1)(A), the Valks can avoid each of the 71 transfers by proving the following four elements: (i) a transfer; (ii) of the Debtor's property; (iii) that occurred within two years before the petition date; and (iv) that the Debtor made with actual intent to hinder, delay, or defraud existing or future creditors of the Debtor.  *See* 11 U.S.C. § 548(a)(1)(A).  The Valks may recover an avoided transfer, or its value, from the initial transferee (§ 550(a)(1)) or any immediate or mediate transferee (§ 550(a)(2)) subject to certain defenses, as discussed below.

6.      In the case before the Court, it is undisputed that the 71 transfers represented transfers of property of the Debtor to Copper Creek and that the transfers occurred within two years prior to the bankruptcy petition date.  The remaining issue before the Court is whether the transfers were made with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became ... indebted." 11 U.S.C. § 548(a)(1)(A).  If the Valks successfully meet their burden on § 548(a), the burden then shifts to the Defendants to establish an affirmative defense.

7.      The Fifth Circuit has identified badges of fraud that may serve as evidence that a transfer was made with actual intent to defraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after

incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008). Similarly, TUFTA provides a non-exclusive list of badges of fraud that may be considered to find actual intent on the part of a debtor *See* TEX. BUS. & COM. CODE § 24.005(b) (stating "consideration may be given, *among other factors*, to" the listed badges of fraud) (emphasis added).

8.     In this case, the Valks argue that actual intent is established by the following badges of fraud: (i) the transfers were to an insider (the Debtor's spouse's business); (ii) the Debtor retained possession or control of the transfers after the transfers; (iii) before the transfers occurred, the Debtor was threatened with suit by Ron Valk; (iv) the pendency or threat of suit by other creditors; (v) the Debtor was insolvent or became insolvent shortly after the transfers were made; and (vi) the value of the consideration received by the Debtor was not reasonably equivalent to the value of the assets transferred.

9.     First, the term "insider" includes:

(i) relative of the debtor or of a general partner of the debtor;
(ii) partnership in which the debtor is a general partner;
(iii) general partner of the debtor; or
(iv) corporation of which the debtor is a director, officer, or person in control.

11 U.S.C. § 101(31)(A).

10.     Here, the Debtor was a "person in control" of Copper Creek and, specifically, he had control of the disposition of the funds he transferred to Copper Creek. The Certificate of Formation for Copper Creek lists the Debtor as a director, the Debtor was an authorized signatory on Copper Creek's bank accounts, the Debtor generated invoices for Copper Creek, and the Debtor had authority to buy product for Copper Creek and pay its bills. Further, Doni's testimony showed little understanding of the technical and legal aspects of Copper Creek's business such as tax

12

compliance.  Doni relied heavily on the Debtor for guidance.  Thus, it appears that the transfers from the Debtor to Copper Creek were transfers to an entity controlled by the Debtor and his husband, and the Debtor retained control over the funds he transferred.

11.     Next, the Debtor had been threatened with, or was a defendant in, various lawsuits from September 20, 2017 through the filing of bankruptcy on September 20, 2019.  The Debtor made transfers to Copper Creek throughout this period.  All but 8 of the 71 challenged transfers occurred after the Valks had filed suit against the Debtor in 2018.

12.     With respect to the pattern of the challenged transfers, the Valks argued in closing that the Debtor was attempting to defraud his creditors by diverting funds to Copper Creek to pay for renovations to his exempt homestead.[8]  However, it is not clear from the record to what extent the 71 challenged transfers totaling $158,807.43 related to the renovation.  Moreover, the record does not show a systemic depletion of the Debtor's non-exempt assets through the transfers to Copper Creek; the Defendants traced $87,885.59 in transfers from Copper Creek *to* the Debtor during the same time frame.

13.     At trial, the parties disputed whether the Valks had established that the Debtor made the challenged transfers while he was insolvent as an additional badge of fraud.  When referring to an individual debtor, the term "insolvent" is defined in § 101(32)(A) of the Bankruptcy Code as meaning "financial condition such that the sum of [the debtor's] debts is greater than all of such [debtor's] property, at a fair valuation" exclusive of property fraudulently transferred, concealed, or removed, and exclusive of property that may be exempted.  "Courts refer to this as a balance

---

[8] In their written closing argument, the Defendants assert that the Debtor only transferred $63,762.02 to Copper Creek based on a spreadsheet (Defendants' Exhibit T) that purports to trace "loans" from Copper Creek and "loan payments" by the Debtor.  However, there was no documentation of any loan by or between the Debtor and Copper Creek.  The preponderance of the evidence at trial established that the Debtor and Escoffie moved funds between personal and business accounts as needed to pay bills.

13

sheet test, and engage in the 'fair valuation' of the debts and property shown on the debtor's balance sheet." *Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners, LLC*), 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re Lamar Haddox Contractor, Inc.,* 40 F.3d 118, 121 (5th Cir. 1994)).

14.     In their closing, the Valks argued that the Debtor was insolvent when he made the challenged transfers based on the balance sheet test.  The Valks drew this Court's attention to the Debtor's bank statements, his credit card statements, his SOFA, and the damages various individuals were seeking from him in lawsuits.  The Valks' argument, which only includes funds in bank accounts and excludes non-cash assets such as receivables and the Debtor's interest in TV Arrowhead, is incomplete and insufficient to meet the balance sheet test for insolvency.  However, the Valks established that the Debtor was not able to pay all his debts as they came due when he made the challenged transfers.

15.     At trial, the Valks focused on the Debtor's liquidity, or lack of, to establish what they referred to as "balance sheet insolvency."  The Debtor maintained balances on numerous credit cards.  State courts had entered judgments exceeding $260,000 against the Debtor in 2018 and 2019, which he did not pay.  The Debtor remained a defendant in several cases seeking, collectively, hundreds of thousands of dollars in damages against him when he filed for bankruptcy in September 2019.  The Debtor had failed to pay all his federal income taxes for many years, and he owed more than $170,000 to the IRS.  Although the Debtor valued his interest in TV Arrowhead at $325,000 in his bankruptcy schedules, the bankruptcy estate only received $153,708.90 from the sale of TV Arrowhead's lake house after settling the ownership dispute with Shawn Valk. Further, the Debtor's testimony that his claims against the Valks were worth at least $1 million

was not credible and was undermined by the fact that the Chapter 7 trustee sold those claims and others to the Valks for $50,000 based on his business judgment.

16.     The Debtor's bank statements show that he moved large sums through his accounts each month.[9]  The Debtor's bank and credit card statements also show that when he occasionally received large payments for his work on construction projects, he promptly used the funds to pay some of his personal and business debts.  The Debtor, however, was accruing more debt than his income could pay.

17.     The Court finds and concludes that the Debtor did not reasonably believe he would be able to pay all his debts as they matured when he made the transfers to Copper Creek.  The preponderance of the credible evidence established that the Debtor was unable to pay all his debts as they came due in the two years prior to bankruptcy.  He continued to pay his personal debts and operate his businesses in the years prior to bankruptcy by delaying payments to some creditors, not paying others (especially his judgment creditors), and juggling money between various accounts and entities.

18.     Next, the Valks argue that the Debtor did not receive reasonably equivalent value in exchange for the challenged transfers as an additional badge of fraud.  "Reasonably equivalent value" is a term used in the context of constructive fraud under Bankruptcy Code § 548(a)(1)(B).  However, the Code does not define "reasonably equivalent value" as used in § 548(a)(1)(B).  While § 548(d)(2)(A) does define "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor," courts have been left to judicially define what constitutes "reasonably equivalent value" for purposes of § 548.

---

[9] The Valks introduced into evidence several binders filled with bank and credit card statements for accounts belonging to the Debtor.  Their closing statement contains an analysis of those records.

19.     In the context of determining intent to defraud under § 548 of the Bankruptcy Code, the Fifth Circuit has described the applicable badge as whether there was a lack or inadequacy of consideration – not whether there was an exchange of "reasonably equivalent value." *See Soza*, 542 F.3d at 1067.  Nonetheless, these concepts are substantially similar. *See* TEX. BUS. & COM. CODE § 24.005(b) (including as one of the badges of fraud whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred").  Cases interpreting TUFTA, which does reference "reasonably equivalent value" as the measure whether consideration was adequate, are frequently relied on in § 548 cases and vice versa. *See Warfield v. Byron,* 436 F.3d, 551, 558 (5th Cir. 2006).

20.     To determine whether reasonably equivalent value was provided, many courts have adopted a two-step process.  First, a court determines whether the debtor received an economic benefit at the time of the transfers or obligations. *See Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1127 (5th Cir. 1993).  Second, the value provided must be "reasonably equivalent" to what the debtor received. *See Think3 Litigation Trust v. Zuccarello et al.* (*In re Think3, Inc.*), 529 B.R. 147, 200 (Bankr. W.D. Tex. 2015).  The second inquiry of valuation is more difficult and is "inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter the challenged transaction." *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo),* 263 B.R. 214, 220 (W.D. Tex. 2000).

21.     The 71 transfers at issue in this proceeding were made from September 20, 2017, to August 2, 2019, and totaled $158,807.43.  In exchange, the Debtor received $87,885.59 from Copper Creek during the same period.  In their closing arguments, the Defendants argued that the Debtor received additional value by assisting a company owned by his spouse, Doni Escoffie.  However, the evidence admitted at trial did not establish that Copper Creek was a profitable

business, and there is no evidence that the transfers from the Debtor created any "synergy." *See Matter of Fairchild Aircraft Corp*, 6 F.3d 1119, 1127 (5th Cir. 1994) (recognizing indirect financial benefits such as synergy between merging two entities and increased monetary "float"). Moreover, indirect, non-economic benefits to the Debtor in the form of supporting his marital relationship with Doni or Doni's business do not constitute "reasonably equivalent value." *See, e.g., In re Jolly's, Inc.,* 188 B.R. 832, 842 (Bankr. D. Minn.1995) (transfers made solely for benefit of third party do not furnish reasonably equivalent value); *Biggs v. United States Nat'l Bank,* 11 B.R. 524, 527 (D. Neb. 1980) (same). *See also, e.g., In re Treadwell,* 699 F.2d 1050, 1051 (11th Cir. 1983) (love and affection not reasonably equivalent value); *Zahra Spiritual Trust v. United States,* 910 F.2d 240, 249 (5th Cir. 1990) (spiritual fulfillment not reasonably equivalent value); *In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997) (release of possible burdens on marital relationship not reasonably equivalent value); *Henkel v. Green (In re Green),* 268 B.R. 628, 651 (Bankr. M.D. Fla. 2001) (debtors "understandably felt a moral or family obligation" to pay for their daughter's wedding or to make a sizeable wedding gift, but satisfying such a moral obligation is not reasonably equivalent value, nor is "love and affection").

22.    In addition, the Defendants' characterization of some of the 71 transfers they received from the Debtor transfers as "loans" or "loan repayments" was not credible. The Defendants did not present any loan documents, accounting or book entries, tax returns, balance sheets, or any testimony as to the existence and terms of the alleged loans. Rather, the record reflects that the Debtor and Doni transferred funds between accounts as necessary to pay whatever debts were most pressing.

23.    In summary, the Valks established many badges of fraud. The Debtor transferred funds to an insider, Copper Creek, and he retained control over the funds. The consideration he

received was inadequate, and he did not receive reasonably equivalent value for the transfers to

Copper Creek.  The Debtor knew he was unable to pay all his debts as they came due when he

made the transfers to Copper Creek, and lawsuits were pending or had been threatened at the time

of the transfers.  Based on the Court's determination of the credibility of witnesses and the presence

of numerous badges of fraud, as well as the Debtor's use of some of the funds he transferred to

Copper Creek to pay his personal expenses, the Court finds that the Debtor made transfers to

Copper Creek with the "actual intent to hinder, delay, or defraud," 11 U.S.C. § 548(a)(1), his own

creditors.

## Constructive Fraud - § 548(a)(1)(B)

24.    Section 548(a)(1)(B) of the Bankruptcy Code provides for the avoidance of

transfers made with the constructive intent to defraud as follows:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit
> of an insider under an employment contract) of an interest of the debtor in property,
> or any obligation (including any obligation to or for the benefit of an insider under
> an employment contract) incurred by the debtor, that was made or incurred on or
> within 2 years before the date of the filing of the petition, if the debtor voluntarily
> or involuntarily—
> ***
> (B) (i) received less than a reasonably equivalent value in exchange for such
> transfer or obligation; and
> > (ii)(I) was insolvent on the date that such transfer was made or such
> > obligation was incurred, or became insolvent as a result of such transfer or
> > obligation;
> > (II) was engaged in business or a transaction, or was about to engage in
> > business or a transaction, for which any property remaining with the debtor
> > was an unreasonably small capital;
> > (III) intended to incur, or believed that the debtor would incur, debts that
> > would be beyond the debtor's ability to pay as such debts matured; or
> > (IV) made such transfer to or for the benefit of an insider, or incurred such
> > obligation to or for the benefit of an insider, under an employment ontract
> > and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

25.     Thus, to establish a claim for avoidance of a transfer as constructively fraudulent under § 548(a)(1)(B), the Valks must prove each the following elements: (i) that the transfer was of an interest of the Debtor in property; (ii) that the Debtor made the transfers on or within two years before the petition date; (iii) that the Debtor received less than a reasonably equivalent value in exchange for the transfers; and, inter alia, (iv) that the Debtor was insolvent on the date that the transfer was made or that the Debtor intended to incur, or believed he would incur, debts that would be beyond his ability to pay as such debts matured.  The Valks bear the burden of proof by a preponderance of evidence on all elements of their claim for constructive fraud.  *See, e.g., Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 436 (Bankr. S.D.N.Y. 2011) (citation omitted).

26.     There is no dispute that the 71 transfers to Copper Creek involved an interest of the Debtor in property and were made within two years before the bankruptcy petition date.  For the reasons previously discussed, the Debtor did not receive reasonably equivalent value for the transfers.  Further, the Debtor did not reasonably believe he would be able to pay all his debts as they matured when he made the transfers to Copper Creek.  *See* 11 U.S.C. § 548(a)(1)(B)(III).  Accordingly, the Court finds and concludes that the Valks have established that the 71 transfers the Debtor made to Copper Creek were made with the constructive intent to defraud.

### Good Faith - § 548(c)

27.     Having determined that the transfers to Copper Creek are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A) and (B), the Court next turns to Copper Creek's affirmative defenses under § 548(c).  Under this section, a transferee of a fraudulent transfer avoidable under subsection (a) may retain any interest transferred to the extent that it was taken in "good faith" and in exchange for "value" given by the transferee.  11 U.C.C. § 548(c).

19

28.    Value is a statutorily defined term meaning "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A).  The extent to which a defendant "gives value" for a particular transfer is essentially the flip side of the question of whether the debtor received "reasonably equivalent value" in exchange for the transfer. *In re Taubman,* 160 B.R. 964, 987 (Bankr. S.D. Ohio 1993).   Further, the "terms — 'reasonably equivalent value' in § 548(a)(1)(B) … and 'value' in § 548(c) — have the same fundamental meaning."  *Canyon Systems Corp.,* 343 B.R. 615, 650–51 (Bankr. S.D. Ohio 2006) (citing *Balaber–Strauss v. Sixty–Five Brokers* (*In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000)).

29.    The difference between the "value" analysis under § 548(a) and § 548(c) is the perspective.  Under § 548(c), value is considered from the perspective of the defendant/transferee giving value rather than from the debtor/transferor's perspective of what value was received. *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002). Thus, the value analysis for the good-faith defense is viewed from the perspective of Copper Creek, and the question is "[h]ow much did the transferee 'give?'   The concern here ... is for the transferee's side of the exchange, not the transferor's gain." *Id.*  As the Fifth Circuit explained in *Hannover,* the § 548(a) inquiry is into the loss to the debtor – that is the injury to the estate that makes the transfer voidable – while the affirmative defense in § 548(c) looks at what the transferee gave back and thus, its cost to the transferee.  *Id.* at 802.

30.    In this case, as discussed supra, the 71 transfers at issue were made from September 20, 2017, to August 2, 2019, and totaled $158,807.43.   The Defendants traced $87,885.59 in transfers from Copper Creek ***to*** the Debtor during the same time.

31.     However, the Defendants can employ the good faith defense only if they took for value *and* in good faith.  *In re Am. Hous. Found*., 785 F.3d 143, 162–65 (5th Cir. 2015) (noting that the § 548(c) defense requires value and good faith, which focuses on whether a transferee reasonably should have known of the fraudulent intent underlying the transfer).  The good faith test under § 548(c) is a two-step inquiry: (i) whether the transferee was on inquiry notice that the transferor was insolvent; and (ii) if the transferee has been put on inquiry notice, whether the transferee conducted a diligent inquiry reasonable under the circumstances.  *Id.* (citation omitted).

32.     Here, the Defendants are not entitled to the good faith defense even if Copper Creek gave some value for the transfers it received from the Debtor because Copper Creek did not take in good faith.  The Debtor was an insider of Copper Creek with control over its operations and finances.  The Debtor, wearing his Copper Creek hat, was aware that he intended to hinder, delay, or defraud his creditors.  Further, Doni was aware that the Debtor did not always have the funds to pay important personal debts such as his mortgage and car note, and Doni sometimes transferred funds from Copper Creek to the Debtor when he needed to pay those and other personal bills.  Doni was on inquiry notice of the Debtor's insolvency and did no investigation whatsoever.  Thus, the § 548(c) defense is not available in this case.  The Defendants' good faith defense fails.

### Recovery - § 550

33.     Finally, § 550 of the Bankruptcy Code prescribes the liability of the transferee for an avoided transfer.  Section 550(a) provides as follows:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
>   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>   (2) any immediate or mediate transferee of such initial transferee.

21

11 U.S.C. § 550(a). "Section 550(a) distinguishes between initial transferees and subsequent transferees who receive the transferred property either directly from the initial transferee or from a later transferee." 5 COLLIER ON BANKRUPTCY ¶ 550.02 (16th ed. 2023)

34.     Here, all the 71 transfers at issue went to Copper Creek. The Valks therefore can recover from Copper Creek as the initial transferee under § 550(a)(1). The Valks did not trace any of the 71 challenged transfers from Copper Creek to Doni. He therefore is not liable as subsequent transferee of Copper Creek under § 550(a)(2).

35.     The Valks did not seek to pierce Copper Creek's corporate veil in this adversary proceeding or establish that Doni was Copper Creek's alter ego. These issues were not included in the parties' joint pre-trial order.

36.     On the eve of trial, after this Court entered the parties' joint pretrial order, a jury entered a verdict in a state court lawsuit by the Valks against Doni, among others. The Valks discussed the verdict in their arguments at trial, but a final judgment had not yet been entered and is not part of this Court's evidentiary record. [10]

37.     Nonetheless, in their written closing argument, the Valks asked this Court to find that Doni was the alter ego of Copper Creek and, therefore, is liable for the fraudulent transfers to it based on the state court verdict. The Valks argued that the jury's finding "precludes relitigation" of the issue of whether Doni is the alter ego of Copper Creek. However, that issue was not litigated in this proceeding. This Court has not reviewed the state court judgment, which was entered after the trial of this proceeding, or analyzed its preclusiveness under applicable federal law.

38.     Moreover, a finding that Copper Creek is the alter ego of Doni would contradict the record the Valks created in this case. The Valks presented evidence at trial, and argued, that

---

[10] Counsel for the Valks attached a copy of a Final Judgment dated December 16, 2022, to his written closing argument. Defendants filed a response indicating they intend to seek reconsideration of the Final Judgment.

Doni knew little about the business of Copper Creek and that it was the Debtor who guided Doni's operation of the business and who controlled the funds he transferred from his personal account to Copper Creek. The evidence in this case might support a finding that the Debtor was an alter ego of Copper Creek, but not Doni.

39.    Under the circumstances, the Court finds that the Valks failed to timely request a finding that Doni is liable as an alter ego of Copper Creek and, based on the evidence presented at trial, failed to establish grounds for such a finding or conclusion.

### CONCLUSION

For all the foregoing reasons, the Court concludes that the Plaintiffs, Ron and Shawn Valk, have established by a preponderance of the evidence that the Debtor made transfers to Copper Creek with actual or constructive intent to defraud his creditors under § 548 of the Bankruptcy Code and that Copper Creek received avoidable transfers totaling $158,807.43. The value of these transfers may be recovered from Copper Creek, but not Doni, pursuant to § 550(a)(1) of the Bankruptcy Code. The Court will enter a separate Judgment consistent with this Memorandum Opinion.

Signed on 03/31/2023

*Brenda T. Rhoades*            SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE